PATTON v. OAKMAN.

1. Contracts—Cost Plus Construction—Findings of Court.
   In contractor's action against owner for balance due for services rendered under cost plus construction contract where record shows plaintiff made a proposition to construct the building either on a 5 or 10 per cent. basis, was instructed to go ahead with the construction, did do so, and completed the work, plaintiff's action was a consummation of the contract for which he was entitled to remuneration at percentage found by court to have been agreed upon.

2. Same—Commissions—Cost Plus Construction—Evidence.
   Claim of plaintiff contractor for 10 per cent. commission under cost plus construction contract held, established by preponderance of evidence, where evidence was undisputed except as to amount of percentage.

3. Trial—Affirmative Defenses—Burden of Proof.
   When the defense of payment, set-off or settlement is interposed by a defendant, the burden is upon him to establish by a preponderance of the evidence the truth of the items of payment, set-off or settlement and not on plaintiff to show lack of merit in the defense.

4. APPEAL AND ERROR—NONJURY LAW CASE—FINDINGS OF TRIAL
COURT—EVIDENCE.

On appeal in action at law tried without a jury, the Supreme
Court is loath to disturb findings of the trial court if there
is any credible testimony to sustain them.

5. CONTRACTS—AFFIRMATIVE DEFENSES—BURDEN OF PROOF—EVI-
DENCE.

In nonjury action at law by contractor to recover his commis-
sion on cost plus construction contract, defendant *held,* not
to have sustained by credible evidence his burden of proof
on defenses of payment, set-off and settlement because of
rent claimed to be due from plaintiff for house occupied by
him.

6. SAME—COST PLUS CONTRACT—COMMISSIONS—INTEREST—PRE-
PONDERANCE OF EVIDENCE.

In contractor's action against owner for balance due for serv-
ices rendered under cost plus contract, judgment of no cause
of action *held,* against the preponderance of the evidence,
the plaintiff's undisputed testimony and admissions of de-
fendant entitling plaintiff to a judgment for commissions
with legal interest from date of completion of the structures
until entry of judgment.

Appeal from Wayne; Callender (Sherman D.),
J. Submitted June 5, 1941. (Docket No. 36, Cal-
endar No. 41,486.) Decided September 2, 1941.

Assumpsit by James Clarence Patton against
Robert Oakman for commissions. Set-off and re-
coupment for rent. Judgment of no cause of ac-
tion. Plaintiff appeals. Reversed and remanded
for assessment of plaintiff's damages.

*Bulkley, Ledyard, Dickinson & Wright (Glenn D.
Curtis,* of counsel), for plaintiff.

*Edward N. Barnard,* for defendant.

CHANDLER, J. The plaintiff and appellant herein
has been engaged in business as a building contrac-

tor for upwards of 25 years, during which time he has built 40 to 50 buildings for the defendant, who has for many years past been an extensive real estate operator and builder in the city of Detroit, and who has constructed many hundreds of buildings therein. Plaintiff first commenced work for defendant when he was about 21 years of age.

The record is conclusive that the business and personal relationship of plaintiff and defendant had been for 25 years, and still was during the trial of this case in the court below, very intimate; the testimony of each disclosing that which is rarely found between parties litigant, an abiding faith in the integrity of each other, as well as true friendship of each for the other.

This litigation arises out of the construction of two terraces, or apartment houses, by plaintiff for defendant, one on Miller road, known as the Miller road terrace, and one on Ewald, known as the Ewald Circle terrace, in the years 1930 and 1931.

Plaintiff's version is that in November of 1930, the defendant came to his home and told him he wanted a terrace built on some property he owned on Miller road. That he went with defendant to the property, looked it over, and discussed plans, costs, and compensation for plaintiff as the builder. Plaintiff claims that he figured he could put up about 24 terraces, and that the cost would be about $4,000 a unit plus plaintiff's services. Plaintiff claims that defendant asked what his services would be and that plaintiff in turn asked him "How does 10 per cent. suit you?" that defendant then said "A man is entitled to 10 per cent. on a big building like that. All right, go ahead and get the plans out." Plaintiff then got out the plans and started on the work in January, 1931, and claims that the building was completed on September 8th following; that the cost of said building, exclusive of plaintiff's services, was

$76,191.55; that during the construction, defendant paid to plaintiff to apply on his services $2,000. The only dispute there is between plaintiff and defendant on this contract is whether plaintiff's compensation was to be 10 per cent. or 5 per cent. of the cost, Mr. Oakman insisting that he never agreed to pay 10 per cent., that he was only paying 5 per cent. for other construction work.

In June, 1931, the construction of the Ewald Circle terrace was commenced by plaintiff for defendant and was completed about December 8, 1931. About the commission on this and the cost of the same, there is no dispute. Plaintiff's claim is that he and defendant went to the location of the Ewald Circle terrace and the defendant said he wanted to build another terrace similar to the other one, but said "I can't give you 10 per cent. like the other terrace, 5 per cent. is all I am paying now on any of the jobs." Plaintiff replied "That is all okay with me, Mr. Oakman." That defendant then instructed him to get started in the morning. That the Ewald Circle terrace was constructed at a total cost, exclusive of plaintiff's services, of $54,248.97. No payments were made on this contract, so the only difference between these parties as to the amount to which plaintiff is entitled for his work is as to whether the same should be 5 per cent. or 10 per cent. on the Miller road terrace, there being no dispute at all as to the amount paid plaintiff for his services on that construction.

This case was tried before the court without a jury, and in the discussion of the questions involved on appeal, we deem it essential to have before us the findings of fact and conclusions of the trial court in full. They are as follows:

"In the declaration in this case the plaintiff alleges two contracts with the defendant for the erection of two different buildings that he referred to

as the Miller terrace and the other the Ewald Circle terrace, and alleges that both the contracts were contracts for the erection of the buildings on a cost plus basis, the first one at 10 per cent. and the second one, or the Ewald Circle property, of 5 per cent.

"The court finds that there was a contract or agreement, verbally, between the plaintiff and the defendant for the erection of the Ewald Circle property or terrace on a cost plus basis with an agreed commission of 5 per cent. As to the other terrace, in the other paragraph of the plaintiff's declaration in which plaintiff alleges an agreement for the construction of the Miller road terrace, so-called, 10 per cent., the court finds that there was no definite agreement as to the percentage in the matter of the Miller street terrace, there was no meeting of the minds upon that contract. The plaintiff testifies it was to be 10 per cent. The defendant, Mr. Oakman, testifies that the per cent.—testifies, as I recall it, that he said the 10 per cent. might be reasonable and at that time told the plaintiff that he might go ahead. There is no testimony that the plaintiff said that he would go ahead; no testimony that they had before them at the time any definite specifications or plans for the building, and it is undisputed that the plaintiff did go ahead and construct a building, and it is proven that the cost of that building was approximately $76,191.55. It is established by the proofs that the cost of the other building was $54,248.97. This was approximately 10 years ago, the occasion of these transactions—nine years ago. That Mr. Oakman intended, when he told the plaintiff that he might go ahead with the construction of the Miller terrace, that he expected to pay the same commission, and I believe that at that time he intended, if the plaintiff did go ahead with that terrace, that he would pay him a 5 per cent. commission.

"The matter of keeping records of the transaction was apparently all in the hands of the trust company. Mr. Oakman, I think, has testified very truth-

fully that he did not know anything about those details. It appears that at the time the plaintiff sustained—at the time of making the alleged contracts plaintiff toward the defendant sustained a relation of cordiality and friendship and trust. The circumstances of the plaintiff's occupying Mr. Oakman's house and property, and the terms and circumstances under which he entered into its occupancy and did use it, the time and circumstances of his ceasing to use it in relation to Mr. Oakman's experience, relation to these particular transactions and the other transactions which have been brought into this case, other buildings, and the terms upon which other buildings were constructed, and the commission paid, is to be taken into consideration.

"Has there been at any time a settlement of this claim? The circumstances testified to by Mr. Rebert at the time and place, what was said and what was done at that time, I believe it was on the 9th of May, 1933, the facts that were before both the plaintiff and Mr. Rebert, and I think, under these circumstances, relative to this whole transaction, must be considered—I say, Mr. Rebert's acts and doings in that connection must be considered as representing Mr. Oakman.

"I think at that time Mr. Patton did have in mind all these facts and figures relative to this property that he had been occupying and continued thereafter to occupy, his arrangements with the successors in title of this property, namely the trust company, after Mr. Oakman lost the property—I think the action in that matter with relation to paying or not paying rent must be considered in the light of what Mr. Rebert says was the transaction that occurred on May 9, 1933, relative, not only to these two claims, but to the recoupment claim or counterclaim raised in the defendant's notice of recoupment.

"This is a lawsuit, and not a suit in equity. For the plaintiff to recover, he must prove by a preponderance of the evidence the necessary allegations of his declaration. If it were a suit in equity in con-

nection with the matter of the mortgage which was offered in evidence, that is a declaration or suit upon, as I understand the mortgage or the notes that were secured by the mortgage of $2,000—if they were on the chancery·side of the docket with a prayer for an accounting, I can see how there might be equitably a claim for that mortgage, or the amount of that mortgage, or the amount of it, if any, which plaintiff has been required to pay, based upon the statements between Rebert and the plaintiff at the time of the alleged settlement. The fact that Mr. Patton continued after that alleged statement and settlement—and, of course, there is a difference between Mr. Patton and Mr. Rebert as to just what was said and done at that time—I believe that substantially what Mr. Rebert says was said or agreed to by Mr. Patton at that time. And Mr. Patton's continuing from that 9th day of May, 1933, for almost six years without sending any bill, or so far as I can recall from this evidence, making any claim to Mr. Oakman for this commission—that I say is significant as bearing upon what was, at the time of the alleged settlement on the 9th of May, 1933, in the mind both of Mr. Patton and Mr. Rebert.

"My conclusion upon the whole controversy is that the plaintiff has not made out a case entitling him to any verdict upon the declaration. I don't believe that either Mr. Patton or Mr. Oakman knew whether one of them owed the other anything. If this suit had been a suit in chancery to determine that, I think possibly the court might have made a determination, but in the form in which this action is brought, the evidence does not, by a fair preponderance, support the allegations of the declaration, and it is the verdict of the court that the plaintiff do not recover, and a verdict of no cause of action."

It will be noted that the court in its determination found that the defendant said to the plaintiff "that 10 per cent. might be reasonable and at that

time told plaintiff that he might go ahead." The court stated: "There is no testimony that plaintiff said he would go ahead" and concluded that there was no definite agreement as to percentage in the matter of the Miller road terrace, that there was no meeting of the minds upon that contract.

If the court's findings of fact as above quoted are correct, it was clearly in error in concluding that there was no definite agreement as to the percentage plaintiff was to receive. The record is undisputed that plaintiff made a proposition to construct the building either on a 5 or 10 per cent. basis; that he was instructed to go ahead, and that he did go ahead pursuant to this agreement. Plaintiff's going ahead with the work pursuant to directions by defendant and completing it was a consummation of the contract for which the defendant is bound to pay whatever was agreed upon between the parties. If it was, as the court found, that defendant said 10 per cent. might be reasonable and to go ahead, then there is no question about the amount plaintiff is entitled to be paid for the construction of these two terraces.

This suit was instituted about September 1, 1937. The plaintiff sought recovery upon the contracts above referred to and also upon the common counts, and filed his bill of particulars. In the answer of defendant to said declaration, the defendant denied all of the material allegations in plaintiff's declaration, and by way of set-off and recoupment claimed that the plaintiff was indebted to him for rent of property of defendant occupied by plaintiff at the rate of $150 per month from May 1, 1930, to and including a date not set forth in his answer, and that during the course of said tenancy plaintiff paid to the defendant rent in the total sum of $2,600, and claimed that defendant was entitled to recover from plaintiff the sum of $5,150.

It will be noted that neither in the answer of defendant nor his notice of set-off and recoupment did defendant make any reference to or claim that a settlement had been made between the parties hereto. However, upon the trial of the case, it was claimed by defendant, by his office manager, that a settlement was effected between plaintiff and defendant whereby their accounts were balanced, and the trial court, in effect, found that in May of 1933, a settlement of the·claim sued upon was made between plaintiff and defendant's office manager, Charles E. Rebert, acting for and on behalf of defendant.

We are at a loss to understand what the trial judge had in mind when he concluded:

"My conclusion upon the whole controversy is that the plaintiff has not made out a case entitling him to any verdict upon the declaration. I don't believe that either Mr. Patton or Mr. Oakman knew whether one of them owed the other anything. If this suit had been a suit in chancery to determine that, I think possibly the court might have made a determination, but in the form in which this action is brought, the evidence does not, by a fair preponderance, support the allegations of the declaration, and it is the verdict of the court that the plaintiff do not recover, and a verdict of no cause of action."

As a matter of fact plaintiff established by undisputed testimony every allegation in his declaration, excepting one, and that one was that the contract provided for a 10 per cent. commission on the Miller road terrace and not 5 per cent. as contended by defendant, and that dispute was resolved in favor of plaintiff by the finding of the trial court. Therefore, plaintiff's claim was established not only by a preponderance but by undisputed evidence, except in the instance above referred to.

The trial court seemed to be somewhat confused, or else we are, about a court of law having jurisdiction over the subject matter. The opinion to us indicates that the trial court was of the opinion that a court of equity was the proper forum, in which case "the court might have made a determination." We must hold that plaintiff has an adequate remedy at law, and ample provision is made by the law and court rules for the establishment of the defense here sought to be interposed by defendant, that of payment and set-off. We might also add that when such defense is interposed the burden is not on the plaintiff to show that there is no merit to such defense, but that the burden is upon the defendant to establish by a preponderance of the evidence the truth of his items of payment and set-off.

The defense of settlement was not pleaded but proof of settlement was offered by defendant and admitted. The burden in such instance is the same; one claiming a settlement has the burden of proving that there was a fair and full settlement.

There was no proof offered in support of defendant's plea of recoupment.

The proof in support of claims of payment, set-off, and settlement and the proof to the contrary are so intermingled in the record that we will discuss these questions together after a statement of the facts as we glean them from the record.

Prior to May, 1930, plaintiff had been living in one of defendant's houses on Sorento avenue for which he paid no rent. This was pursuant to an agreement between the parties and in accordance with what might be termed a custom employed by them, that is, that plaintiff should move his furniture into defendant's houses and live there, show them to prospective purchasers, and make an effort

to sell them. This had been customary to the extent that plaintiff had done this on at least eight former occasions. This was the proof on the part of both parties to this action, but the parties are not in accord as to the agreement and understanding with reference to the house in which plaintiff moved in May, 1930, known as 2854 Oakman boulevard, for which defendant is claiming rent.

Plaintiff's version of the agreement is:

"Mr. Oakman says, 'Pat, that big house on Oakman boulevard begins to look like a haunted shack, it has been vacant for five years. * * * Now I have to keep it heated, and I got to keep a watchman there, I got to keep the grass cut. I want you to move in there if you can.' I said, 'Well, I am afraid it is going to cost too much to live in that big house.' He said, 'As long as you can keep the heat up and watch it for me, I want you to move in there and I am not going to charge you any rent for it. We will see if we can sell it with your furniture in there.' "

Defendant's version of the understanding is shown by the following testimony given by him:

"Mr. Patton moved into the house on Oakman boulevard. I remember the occasion and I remember him moving in and all like that. I don't remember the year. I don't know how long the house was vacant before he moved in. I don't remember whether I asked Mr. Patton to move into it. All I know is he wanted to go in there. He wanted to make a bargain like that. I said go to the office and settle it up. They made some arrangements with Mr. Rebert with it. I didn't make any arrangement with him. He went up to the office and settled it with regard to the amount."

Defendant further testified:

"I never told Mr. Patton that the house looked as if it was a haunted house if it remained vacant and

never asked him to go there and live in it for nothing. I think he said he was just moving out of a house or sold a house and would like to take the house and would pay some rent. I think he mentioned something about the amount. I said,' 'You see Charlie,' meaning Mr. Rebert. I said if he said $25 a month I suppose I would let him have it for $10 a month. I told him, 'Go see Charlie and let you and Charlie fix it up satisfactory to yourselves.' I wanted to have Pat taken care of, and Charlie would take care of our end and make a fair deal a liberal deal to Pat. I did not fix the rent at all and never told him he could live there for nothing. I don't know how it was fixed until it came up in court.

'' Cross-Examination

''*Q.* Mr. Oakman, did Mr. Patton live in some other houses of yours without paying rent until they were sold?

''*A.* I suppose he did.

''*Q.* You are familiar with Mr. Patton's furniture, are you not?

''*A.* No, I don't know anything about the man's furniture.

''*Q.* Have you ever been in Mr. Patton's home?

''*A.* Yes, I always found it a very pleasant home. He has a nice wife, everything like that. I couldn't tell whether it is a wooden chair or steel chair.

''*Q.* He has a great deal of very nice-looking, expensive furniture, does he not?

''*A.* It was a nice-looking home. I always thought it was quite nice, and he used to move it from house to house once in a while.

''*Q.* But you did have him live in various houses of yours rent free until the property was sold?

''*A.* Well, he did as he liked. I built the house. He wanted to sell it, he would put the furniture in and make it look nice and sell it. I never knew whether he paid rent or not. Never asked him to pay it.

''*Q.* That is what he did in this case?

"*A.* I took his selling of the property and sending in notice of the rents, because I never rented any stuff.

"*Q.* That is what he did in this case, moved in rent free?

"*A.* I said no. Don't try to monkey with me. At first I did. He did used to live in and pay no rent. They sometimes kept a house open for a month or two until they sold it. I haven't any doubt but that is true. I don't know anything about it, but I think they did usually, but when you try to put in my mouth it was this way and the other, you are just trying to be funny. Now don't try to be funny with me now, because I don't tell any lies. * * *

"*Q.* No, Mr. Oakman, don't get me wrong. I am not trying to put words into your mouth.

"*A.* You are trying to impeach me. You are up to something.

"*Q.* I am just trying to find out whether or not you told Mr. Patton that he would have to pay rent for that house when he moved into it.

"*A.* I never used any such language. I never said, 'You don't have to pay any rent.' Mr. Patton himself suggested that. I told him to see Charlie and fix it up."

From the foregoing it clearly appears that there was no agreement between plaintiff and defendant as to the amount of rent, if any, that plaintiff should pay to defendant for the house in question.

It appears from the record that defendant was conducting certain of his business in his individual name and certain of it was being done by the Robert Oakman Land Company, of which he was the principal owner, and that defendant employed the Union Guardian Trust Company as his rental agent, which company looked after the renting of his property and the collection of rents, also kept the books of the company, as well as his own individual books.

The terraces were built by defendant in his individual capacity and the house that was occupied by plaintiff was also owned by Mr. Oakman.  Mr. Oakman had an office manager, Charles E. Rebert, who was the principal witness in the case on behalf of defendant.  He testified that plaintiff moved into the Oakman boulevard property about May 1 or 15. 1930; that the rent was $150 a month and that plaintiff paid the first nine months' rent in advance, amounting to $1,350; that plaintiff never paid any rent subsequent to this, excepting on October 22, 1935, when plaintiff paid to him $100, and obtained a receipt which was an exhibit in the case and is as follows:

"Received of J. Clarence Patton
One Hundred and no/100 Dollars
For rent 2854 Oakman Blvd. to November 22, 1935.
$ 100                    (Sgd.)  Robert  Oakman
                              By C. E. Rebert"

Mr. Rebert claims this receipt was given at the request of plaintiff because on November 22, 1935, Mr. Oakman's right of redemption from mortgage foreclosure on the property in question would expire, and that plaintiff desired to rent the property from the trust company, which became the owner of the property by reason of such foreclosure, and wanted a receipt to show that he had paid rent in full to that time.  Plaintiff denied that he paid any rent in advance or had any agreement with Mr. Rebert with reference to rent, but that he did, sometime in 1933, after learning that Mr. Oakman was in financial distress, offer to pay him rent at the rate of $100 per month, and that he did from then on, until the property was lost to defendant, pay rent

at the rate of $100 per month. The circumstances under which these arrangements were made and rent paid will be discussed later in this opinion.

Referring again to the testimony of Mr. Rebert, he gave testimony that on May 9, 1933, he made a full settlement of defendant's account with plaintiff. Inasmuch as the trial court in his opinion, finding that a settlement had been made between Mr. Rebert and Mr. Patton, gave credence to the testimony of Mr. Rebert, we find it necessary to discuss somewhat in detail the testimony of Mr. Rebert and the circumstances surrounding the transaction.

Mr. Rebert testified that some time in May, 1933, at the office of Mr. Oakman, he and plaintiff went over the accounts between plaintiff and defendant. Witness testified that he had at that time a statement which he made up from the books of the Union Guardian Trust Company, which statement was before the court on the trial and was known as Exhibit 5 and showed substantially the following: A credit to plaintiff for commission on the Miller road terrace of 5 per cent. on $80,869, less amount paid of $2,000, leaving a balance of $2,043.45; commission of 5 per cent. on Ewald circle terrace amounting to $2,701.45, making a total of $4,744.90, owing to plaintiff. That debits against this from plaintiff to defendant were as follows: Second mortgage $1,919.46; rent, March 1, 1931, to July 1, 1933, $2,800, making a total of charges against plaintiff of $4,719.46. Witness testified that he and Mr. Patton then and there agreed to balance accounts. This mortgage of $1,919.46 was never paid by defendant or his land company and plaintiff was required to pay it.

For the purpose of determining how much credence should be given the testimony of this witness, we quote quite extensively from the record:

"*Q.* And who were the papers [Exhibit 5] prepared by, the pencil memo, and from whose books?

"*A.* By Mr. North.

"*Q.* Who is Mr. North?

"*A.* Mr. North was assistant with me in Mr. Oakman's office.

"*Q.* Whether or not those figures were prepared at the request of Mr. Patton?

"*A.* Mr. Patton came in and said we owed him some money.

"*Q.* This was 1933?

"*A.* We checked the matter up and we found we had paid him $2,000 on the one terrace, and the other one we had not paid. We also found that he was also in arrears on his rent on Oakman boulevard.

"*Q.* Giving him credit for the thirteen hundred some dollars?

"*A.* We did.

"*Q.* And what did you find then? What did you both agree to be the cost of the terrace—did he give you what he claimed was the cost of the terrace?

"*A.* It seemed satisfactory, $80,860.

"*Q.* $80,860. Did you figure in front of him the amount of the percentage?

"*A.* I did.

"*Q.* And how much did you figure it at?

"*A.* 5 per cent.

"*Q.* Was he there at the time?

"*A.* He was.

"*Q.* How much did it amount to?

"*A.* $4,043.

"*Q.* Are these the figures that you made?

"*A.* These are the figures that I made.

"*Q.* From that did you deduct the $2,000 that had been paid?

"*A.* Yes, sir.

"*Q.* How much did that leave?

"*A.* That left $2,043.

"*Q.* Then from that did you also figure the Circle?

"*A.* We figured the Circle.

"*Q.* What figure did he figure on it?

"*A.* $52,028.

"*Q.* At what per cent.?

"*A.* 5 per cent.

"*Q.* Were these figures all made at that time?

"*A.* They were.

"*Q.* Right in the office when he was there for the settlement?

"*A.* They were.

"*Q.* How much did it amount to?

"*A.* The Circle, $2,701. The total was $2,744.

"*Q.* Did you figure his rent at that time?

"*A.* Yes, sir.

"*Q.* How much was it?

"*A.* It amounted to around $2,800.

"*Q.* And then what else did you figure?

"*Mr. Curtis.* What was the exact amount?

"*A.* The exact amount was—it was exactly $2,800.

"*Q.* That was the balance unpaid?

"*A.* That was figured up to July 1, 1933.

"*Q.* Did he stay there after that?

"*A.* He did.

"*Q.* Did he stay there up to the time the property was lost?

"*A.* He did.

"*Q.* Did he pay any more rent with the exception of the $100 paid when he left?

"*A.* He didn't.

"*Q.* And you took $2,800 credit. What other credit did you take?

"*A.* We had a second mortgage on the Aviation Field No. 2 amounting to $1,654, interest computed amounting to $264, making a total due of $1,919, added to the $2,800, made $4,719.43 due us.

"*Q.* You owed him how much?

"*A.* Forty-seven forty-four.

"*Q.* He owed you?

"*A.* He owed us.

"*Q.* How much?

"*A.*    Forty-seven nineteen.

"*Q.*    What did you agree to do, if anything?

"*A.*    We just agreed to check accounts and forget it.

"*Q.*    That was agreed upon at that time?

"*A.*    At that time, yes.

"*Q.*    And subsequent to that time did he remain as a tenant in that house?

"*A.*    He did.

"*Q.*    He remained there from what date is that?

"*A.*    It was May, 1933, we figured to July 1, 1933.

"*Q.*    He remained there from July 1, 1933, until what time did you actually lose this property?

"*A.*    About the first of November, 1935.

"*Q.*    I will ask you whether or not you figured your rent then for that period of time?

"*A.*    We figured it about $100 per month.

"*Q.*    Did that amount off-set the amount of the second mortgage?

"*A.*    It did.

"*Q.*    Did you talk that over with him?

"*A.*    We did.

"*Q.*    Did he agree whether or not that was satisfactory?

"*A.    It seemed to be satisfactory, yes.*

"*Q.*    Did he agree to it?

"*A.    As far as I know, yes.*

"*Q.*    Well, you were there; did he?

"*A.*    Yes, he did. *He didn't object. He didn't say anything against it.*

"*Q.*    Did you tell him that was the off-set?

"*A.*    Absolutely.

"*Q.*    Did you ever receive any bill from him from that time on?

"*A.*    Never did.

"*Q.*    Did you ever consider that Mr. Oakman owed him any amount?

"*A.*    No, we thought the matter was settled. I didn't hear anything until just before the starting of this suit.

"*Q.* Now then, at the time the property was lost by Mr. Oakman, under foreclosure, was it not in 1935, when he lived there?

"*A.* It was not lost by foreclosure. Just then they had a temporary receivership.

"*Q.* That was 1935?

"*A.* And subsequently he lost. Mr. Oakman never did get anything out of that house from November.

"*Q.* Now then, I will ask you whether or not Mr. Patton came to you on October 22, 1935, and offered to become a tenant of the trust company, and paid you any sum of money and asked you to give him a receipt?

"*A.* He did.

"*Q.* How much did he pay you?

"*A.* He paid $100.

"*Q.* Had he been paying $100 per month up to that time?

"*A.* No, sir.

"*Q.* And the only amounts he had not paid were the credits against his bills?

"*A.* That is all, that is all.

"*Q.* The only amounts were the credits as made here?

"*A.* That is right.

"*Q.* Those were his payments, were they?

"*A.* Yes, sir.

"*Q.* Did he ever pay you any cash in any shape or form except when he first started, the nine months, and the $100 paid over there to the trust company?

"*A.* That is right. He was worried over this back rent, that is, what the receiver was going to do about it.

"*Q.* Even though you had off-set it?

"*A.* We had off-set it with a second mortgage, but I hadn't been able to get that second mortgage discharged. I said at this time to Pat, 'Due us for rent equal to the amount of that second mortgage, so we will just say it is a settled question,' we made

a new deal and settled it over again and he started out. That is why that receipt was given to him to start him off even with the new owners.

"*Q.* He has testified on this stand that he had been paying you $100 per month, month after month. Is there any truth in that?

"*A.* No, sir. If so, *the records of the trust company would show it, because they were the trustees of Robert Oakman on that.* That property was sent up to them."

On cross-examination witness testified:

"*Q. Do you have any records on this rental account?*

"*A. Rental account was kept by the rental department of the Union Trust Company.*

"*Q. Where did you get these figures?*

"*A. From them.*

"*Q.* Didn't you keep any figures on the—

"*A.* (Interrupting) We kept a general ledger, a general ledger of controlling accounts. We also worked a system of orders and instructions to the trust company, to Mr. Powless and the bookkeepers down there, telling them what accounts should be charged, and telling what account to take the money from, and what account to charge it to, and they rendered us a monthly report. We not only had daily statements, we had monthly reports. We carried a general ledger of controlling accounts. Only details were all handled by the trust company.

"*Q.* Where did you get this figure, $150 per month rent?

"*A.* From the very start of the matter.

"*Q.* From where?

"*A.* From the very beginning from Mr. Patton, the starting, when the matter was set up in 1930.

"*Q.* Where was it set up?

"*A. It was set up in the rental department of the trust company.* * * *

"*Q.* Where are the books that show Mr. Patton was ever charged $150 per month rent on this house?

"*A. That would be in the rental department of the Union Guardian Trust Company.* Whenever any particular house—those were all in the trust company of Robert Oakman, and *whenever a house was rented in those trusts, we immediately notified the trust company such a house was rented, so much money, to set up an account in that party's name.*

"*Q. Did you do that in this particular case?*

"*A. Yes, sir.*

"*Q.* Have you seen that?

"*A.* Not lately I haven't.

"*Q.* When did you ever see that?

"*A.* Well, I don't know whether I ever did. I would not say that I did, because I had Mr. Norris [North?] get these figures for me.

"*Q.* Then you never have seen the records yourself?

"*A.* I would not say that I did, that particular record, no.

"*Q.* Were you with Mr. Brushford one time when Mr. Patton paid him $250 rent in a restaurant in cash?

"*A.* I don't recall.

"*Q.* There is no mistake about it that this second mortgage was a second mortgage that Mr. Patton signed payable to the Robert Oakman Land Company?

"*A.* That is right.

"*Q.* And that mortgage, Mr. Patton was finally sued upon that mortgage, wasn't he, by the Union Guardian Trust Company?

"*A.* I think he was about two years ago."

After this testimony a Mr. Powless representing the trust company was called in rebuttal. He testified:

"I heard Mr. Rebert testify today that this house on Oakman Boulevard was set up on the trust company books as being rented to Mr. Patton at $150 per month. I have searched the records of the

Union Guardian Trust Company covering this house and I do not find any records of rental being charged at the rate of $150 per month. Exhibit 13 is what we call a property card. It is a memorandum card on which we post the rents. It is a hand-posted card. * * *

"This card is kept in the regular course of business of the trust company. I searched for other records on this house and could find none covering rent besides this Exhibit 13. The only other thing that we have on that house is another rental card which begins November 22, 1935. That is the card marked Exhibit 14. It is a rental card covering the property at 2854 Oakman Boulevard showing the opening date as 11-22-35, and shows payments at the rate of $100 per month."

Exhibit 13 referred to in the testimony of Mr. Powless shows:

"Acct. ROBERT OAKMAN Call #2
   Property address: 2854 OAKMAN BLVD. * * *
   Remarks: Vacant—See R. O. re J. C. Patton occupying house."

After this testimony Mr. Rebert was recalled and on cross-examination testified:

"Q. Where did you figure the rent item?
"A. Right here.
"Q. At how much per month?
"A. My record shows he was paid to 3-1-31, then 3-1-31 to 7-1-33, $2,800 due.
"Q. How much per month was that?
"A. That would be $100 per month, that is upon the months from 3-1-31 to 7-1-33, 28 months, $2,800.
"Q. Where did you get the figure of $150 per month?
"A. That is what he started out at in the beginning when he went in there in May, 1930, and he was paid to March 1, 1931, when we adjusted it.

"*Q.* You still have no records to show the rent was $150 per month?

"*A. I haven't hunted for them.*

"*Q.* Well, do you have them?

"*A. Well, I can hunt for them.*

"*Q.* Do you think you have them?

"*A. Yes sir. I will find them.*"

No records were at any time produced by the defense showing any record of any rent ever charged to plaintiff, nor the receipt of $1,350 from plaintiff in payment of this amount as advance rental, nor the payment of any sums whatsoever by plaintiff to defendant.

Plaintiff denied that he ever paid $1,350 or any other sum as an advance payment on rent, or that he ever paid any rent until commencing some time in the year 1933 when he went to Mr. Oakman and volunteered to pay rent at the rate of $100 per month, and that from that time until the property was lost to Mr. Oakman he paid $100 per month for the property, payments being made either to Mr. Oakman or to Mr. Rebert. Mr. Patton's testimony with reference to this arrangement was as follows:

"We could never sell the house, and I went down to the office. Mr. Rebert told me Mr. Oakman is in pretty bad circumstances, that he needed a little money. * * *

"*A.* So I said, 'Well, now, he really should be in Florida,' and I said, 'I am going to try and keep up $100 a month rent as long as I can.' I asked Mr. Oakman, 'Is that O. K.?' He said, 'Pat, do the best you can. If you got $100, give it to me. If you got $50.' I gave them cash different times, but I don't know what they did with it. I went to Mr. Oakman's house and gave him $300 one time, $400 another. He said, 'This is pocket money, now don't give it to those fellows down to the office or the trust company—meaning the trust company—I will hang

onto this, and I gave him—every time I got any money I brought down to Mr. Rebert. I also gave some to Mr.—sitting in the restaurant, when we went over to have lunch over at a little restaurant across the street from the Oakman building, and Mr. Brushford, who was then in the real estate department, I gave him, I believe $250 cash, and we all agreed Mr. Oakman should have that $250, and Mr. Oakman bought the dinner on it. * * *

"*Mr. Rebert told me later that Mr. Brushford had turned that money in.* I kept turning the money in. I never got any receipts for it, because he just took the money and says, 'All right, we will credit it.'

"*Q.* Did you pay—after you started paying $100 a month, did you pay $100 a month for every month you lived in there until November, 1935?

"*A.* Sometimes I would not pay it all at once. Maybe $250, maybe I would skip for a month or two, maybe I would pay $50. I paid $300, $400, or whatever I could I paid.

"*Q.* But did you pay the full $100 a month?

"*A.* $100 a month, yes, and it was with my suggestion that I paid the $100 a month. Mr. Oakman never asked me for it.

"*Q.* Did you ever get a statement or demand from anyone for $150 a month rent?

"*A.* No.

"*Q.* Did you ever get a statement or demand from anyone for any amount of rent until you voluntarily agreed to pay $100 a month starting 1933 or 1934?

"*A.* No.

"*Q.* Are you still living in the house?

"*A.* Yes.

"*Q.* Mr. Oakman never did sell it?

"*A.* Not that I know of.

"*Q.* And after the trust company took it over you have been paying the trust company the rent?

"*A.* Yes.

"*Q.* After the trust company took it on foreclosure, you have been paying Woodruff. Now I

will show you Exhibits 3, 4, 5 and 6 and ask you which of those you have seen before?

"*A.* I recollect seeing this one here.

"*Mr. Barnard*: That is Exhibit 5?

"*The Court*: Exhibit 5.

"*A.* Yes, Exhibit 5.

"*Q.* Did you ever see Exhibits 3, 4 or 6 before?

"*A.* Not to my knowledge, no.

"*Q.* You heard Mr. Rebert testify that you agreed to the figures contained on these exhibits?

"*A.* I never agreed to them.

"*Q.* What was said at the time that you talked with Mr. Rebert when he had this Exhibit 5 before you?

"*A.* Well, I come down and asked him—I told them I had to have some money on the money that was coming to me from the terraces. I did the jobs, and I guess I went down several times. Finally one day I came in. He said, 'Well, look here, Pat, we don't owe you any money.' So I looked that sheet over and I said, 'What, do you mean you don't owe me any money?' 'Well,' he said, 'here is so much for rent.' I said, 'Mr. Oakman didn't charge me any rent, I just paid that rent voluntarily because I lived in the house.' They had access to the house at any time to bring customers in, advertised to sell the house. I tried to sell it in every way I could, so I said, 'When I started to pay you fellows rent down there it was just more as a gift towards Mr. Oakman and to help things along thinking if they ever got so he could pay the balance of the money he owed me, he would pay it.' I said, 'This is going to help him out a little,' and I just paid the money."

Plaintiff further testified:

"*Q.* Did you talk with Mr. Oakman recently about whether or not you were supposed to pay rent on the Oakman boulevard house?

"*A.* Yes.

"*Q.* What did he say?

"*A.* He said, 'Pat, you and I, *I know we didn't set any price on it, it was just a matter we didn't set any price. You just moved in. We didn't set any price.*' I told Mr. Oakman, 'Well, I just paid all the rent I could. I paid it in cash different times, some in checks just for to help you out,' *and he agreed with me that was all right.*"

None of the above-quoted testimony was contradicted by defendant Oakman. Nor did Mr. Rebert deny that he had told plaintiff that Mr. Brushford had paid the $250 over to him for Mr. Oakman.

A receipt for $50 on account of rent bearing date September 5, 1933, given by Mr. Rebert, is quite significant. If the payment of rent commenced about this date and continued until November, 1935, plaintiff's payments of rental would amount to $2,600, exactly the amount he is given credit for in defendant's answer.

The fact that no charge for rent was ever made against the plaintiff on the books of the trust company, defendant's rental agency and bookkeeper, and the failure of witness Rebert, Mr. Oakman's office manager, to produce his office records which he claimed would show the charge items against plaintiff is corroborative of the testimony of plaintiff that no charge for rent was to be made against him, and that no charge was made.

We are loath to disturb the findings of the trial judge in law actions, if there is any credible testimony supporting such findings.

In the instant case on the items of payment and set-off and on the defense of settlement, it is incumbent upon the defendant to establish such defense by a preponderance of the evidence. Here we think the defendant has fallen far short of establishing by credible testimony his defense that plaintiff

is indebted to him in any sum whatsoever for rent; in fact we find from the record here that under all of the circumstances of this case, including the failure of the defendant Oakman to deny plaintiff's testimony that he had paid him substantially $2,600 in rent voluntarily, brands the material part of the testimony of the witness Rebert as unconvincing.

The failure of the defendant to call Mr. Brushford, an employee of defendant, to whom plaintiff paid $250 for Mr. Oakman to apply on rent, and also Mr. North, assistant office manager for defendant, from whom witness Rebert claimed to have secured record information to make up Exhibit 5, as witnesses, leads us to the conclusion that if they had been called, their testimony would have been favorable to plaintiff.

The trial court seemed to feel that the failure of plaintiff to send a bill to defendant after the claimed settlement in May, 1933, was a circumstance corroborative of the testimony of witness Rebert that a settlement had been made. After a careful perusal of the entire record, we attach no significance to this circumstance. The undisputed testimony in this case shows that during the entire years of business relationship between plaintiff and defendant, which had been quite extensive, plaintiff had never once sent a statement or a bill to defendant. It is also undisputed that neither plaintiff nor defendant kept any books on the cost of construction of these terraces, excepting such as were kept by the trust company, and that when plaintiff desired information as to the costs of these constructions he went to the trust company. That when he wanted money he went to Mr. Oakman and as a rule was paid. That when plaintiff asked for money for the balance of construction here, he was told: ''Well,

times are a little tough. Where are we going to get the money? We can't pay right now. We will pay you.''

The following testimony of the plaintiff stands undisputed:

''We waited until about four days before the statute of limitations ran on this before starting suit, because he promised to pay all along up until that time, and I was going away to California and he said 'Well, Pat, I think we will· get things squared away by the time you get back here. I will get it squared around with you.' ''

The claim of plaintiff that he voluntarily .commenced paying Mr. Oakman rent, rather than having it applied on his account, is consistent with his testimony that the only reason he started paying anything at all was to help his friend out so far as cash or pocket money was concerned. It would have been of but little help to Mr. Oakman personally if the rent had been applied on Mr. Patton's account instead of being paid in cash. Mr. Oakman could not go to Florida, which Mr. Patton thought he should do, on credits instead of cash. The record is convincing that Mr. Oakman did not ask Mr. Patton to start paying rent, or to pay it in the first place. It further appears from the record that at the time that plaintiff commenced paying rent to Mr. Oakman the affairs of Mr. Oakman and his realty company were in a receivership, and defendant did not dispute the fact that he was in need of cash or pocket money at the time plaintiff commenced paying him rent in 1933.

The testimony of witness Rebert that plaintiff in 1930, after moving into defendant's house, paid $1,350 in advance as rental, in view of the relationship of the parties litigant, is so highly improb-

able and fantastic, that it is impossible for us to give credence thereto. Combining this together with the testimony of Mr. Rebert that he had obtained the rental figures contained in Exhibit 5, which was the basis of the claimed settlement, from the trust company, which testimony was undeniably shown to be untrue, can lead us to but one conclusion and that is, that in the determination of this controversy, the testimony of witness Rebert should be entirely disregarded.

Our review of the factual aspect of this case is limited to a review of the record herein for the purpose of determining whether the judgment is against the preponderance of the evidence. This is the only error assigned that we have considered necessary to discuss.

After a careful review of the record before us on this appeal, we reach the conclusion that the judgment entered herein was contrary to the preponderance of the evidence and that the same must be reversed.

We have not quoted from nor cited any authorities on the legal principles involved herein as we deem them too elementary to warrant citation of authorities.

In eliminating the testimony of witness Rebert, as we must, we find from testimony of the plaintiff that is undisputed, and admissions of the defendant, that the plaintiff is entitled to recover for the construction of the Miller road terrace a commission of 10 per cent.; for the Ewald Circle terrace a commission of 5 per cent.; plus interest at the legal rate from the respective dates of the completion of said terraces until the entry of a judgment.

The judgment entered in the trial court is reversed and the case remanded to the trial court for

the assessment of plaintiff's damages as herein directed.

Plaintiff will recover costs.

SHARPE, C. J., and BUSHNELL, BOYLES, NORTH, STARR, and BUTZEL, JJ., concurred. WIEST, J., concurred in the result.